VILLAGE OF KENESAW, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT.

FILED JUNE 12, 1912. No. 16,750.

1. Nuisance: INJUNCTION: VILLAGES. Under the corporate and general powers conferred by chapter 14, Comp. St. 1909, upon cities of the second class and villages, a village has the right to maintain an action in equity to enjoin the maintenance and continuance of a public nuisance.

2. ———: ABATEMENT: INJUNCTION. An injunction to prevent the maintenance of the necessary facilities for the loading of live stock by a common carrier will not be granted as a matter of right, but only when it is apparent that this duty may be carried on conveniently elsewhere, and that the evils complained of are substantial and cannot be otherwise remedied.

3. ———: ———: ———: DECREE. In an action to restrain a common carrier from maintaining stock-yards at a certain point within a village, it is not the duty of the court to fix the place to which they should be removed, and a decree which leaves the question of their future location to the defendant, outside of certain limits, is not so indefinite as to be erroneous and void.

APPEAL from the district court for Adams county: HARRY S. DUNGAN, JUDGE. *Affirmed.*

*Byron Clark, Frank E. Bishop* and *John C. Stevens*, for appellant.

*Tibbets, Morey & Fuller, contra.*

LETTON, J.

This is an action to enjoin the defendant railroad company from maintaining stock-yards at the place where they are now situated in the village of Kenesaw.

The trial court found that the stock-yards "are located in or near the center of said village of Kenesaw, in the thickly settled portion thereof; that they are adjacent to the main business street of said village and about 40 feet therefrom, the entrance to said yards, pens and inclosures being about 80 feet from said street; that the same are kept in as good a condition as they can be kept, considering the purposes for which they are necessarily used, by defendant as a common carrier by railroad of live stock; but that, by reason of the manure and the natural odors from the animals therein inclosed, there arises therefrom smells and stenches, and the air thereabout is greatly filled and impregnated with many loud noises and many noisome, unhealthful stenches, stinks and smells, all of which are very offensive to the residents and citizens of the plaintiff and to those persons who necessarily go to and from said village for the transaction of business and otherwise. The court finds that such conditions constitute a great, irreparable, continuing and common nuisance to the citizens and residents of said village. The court further finds that said stock-yards, pens, and inclosures, by reason of the close proximity to the principal streets of said village, their nearness to the business and residence houses of said village, and also by reason of all the facts hereinbefore set forth, and all of the facts alleged in plaintiff's petition, constitute, in their present location, and would constitute at any place within two blocks from such location, a continuing public nuisance which should be abated, and

for which there is no adequate remedy at law. The court further finds that the plaintiff is entitled to maintain this action." A perpetual injunction was granted accordingly.

Three points are argued on behalf of appellant: First, that the village has no right or authority to maintain this action; second, that the court erred in holding that the stock-yards and the maintenance and the use of them were a nuisance, either public or private, which required removal; and, third, that the decree is so indefinite, uncertain and unreasonable that it should be reversed.

As to the contention that the village has no right to maintain the action: It is first argued that there was no public nuisance or offense shown. This will be considered later in passing upon the sufficiency of the evidence.

It is next said that the village is given express authority to deal with the subject of nuisances by ordinances, and is not given any right to sue, and the case of *City of Ottumwa v. Chinn*, 75 Ia. 405, is cited as upholding this argument. We are not impressed with the doctrine announced in that case, and are of the opinion that, under the corporate and general powers conferred by sections 41, 56, 69, art. I, ch. 14, Comp. St. 1909, it was entirely proper to obtain the judgment of a court of equity as to whether or not a public nuisance existed, and its aid to abate the same if one existed. We believe that the supreme court of Minnesota in the case of *City of Red Wing v. Guptil*, 71 Am. St. Rep. 485 (72 Minn. 259), in holding that "a city authorized by its charter to abate or compel the abatement of public nuisances has power to compel the abatement of a nuisance affecting the comfort or convenience of the public, * * * and, therefore, it may maintain an equitable action to aid in compelling an abatement of such nuisance," announces a sounder and better rule. This doctrine is supported by the following authorities: *Hickory v. Railroad*, 141 N. Car. 716, 53 S. E. 955; *Moore v. City of Walla Walla*, 2 Wash. Ter. 184, 2 Pac. 187; *Lonoke v. Chicago, R. I. & P. R. Co.*, 92 Ark. 546, 123 S. W. 395; and by many others. The reasoning

set forth in the opinion in *State v. Ohio Oil Co.*, 150 Ind. 21, 47 L. R. A. 627, with reference to the right and authority of a state to maintain an action for injunction against a public nuisance, which is in line with similar views expressed by this court in *State v. Pacific Express Co.*, 80 Neb. 823, we think applies to the right of a municipal corporation in the same behalf. We prefer to follow the doctrine of these cases, rather than that of the Iowa case cited. We are satisfied that it was not incumbent upon the village to enact an ordinance prohibiting the maintenance of stock-yards in the locality complained of before it had the right to apply to a court of equity for relief.

As to the second point: The evidence shows that about 30 years ago or more, when the railroad was first built and a station located at Kenesaw, the country was new and the town was only in embryo; that during this interval of time the population has increased until there are now about 1,000 people residing in the village. The business of the railroad company has increased in proportion, and it became necessary from time to time to make several additions to the stock-yards in order to accommodate the increased business; the last addition being made about six years ago. The station and the stock-yards were built originally in close proximity. There was no good reason at that time why they should not have been so situated; however, as population increased and business grew, it was entirely natural and proper and to be presumed, in the usual course of events, that the business houses of the community would be erected in the neighborhood of the station, and that this would form the nucleus around which the village would grow. This was what actually occurred. The evidence shows the village, or at least that part of it near the railroad and stock-yards, is built upon land which is almost level; that the railroad company in endeavoring to prevent the nuisance has filled in the stock-yards with broken stone, which has made the floor almost impervious to water and elevated it above the ad-

jacent land so that the filth and excrement, when the
yards are washed or after a heavy rain, drain into an open
ditch running parallel with the railroad, and that the
odors arising from the intermingled mud and excrement
are exceedingly annoying in hot weather to the residents
of the village living on the leeward side of the track.
There being no sewerage or means of rapid drainage, the
facilities for keeping the yards clean are not very good,
so that, while the railroad company seems to have exerted
reasonable efforts to remedy the conditions, it has been
unable to prevent the existence of a nuisance, at least to
an extent very annoying to the residents living near by.
The evidence also shows that live stock is loaded usually
on Wednesday and Sunday, and that the consequent noise
is disagreeable to church goers.  We are inclined to think
that under these conditions the rights of the inhabitants
of the village to freedom from noxious odors and inter-
ference with their Sunday peace and quiet is superior to
that of the railroad company to maintain the stock-yards
in their original situation.  It is true that the railroad
company must have facilities within a reasonable distance
of its station to carry on its business as a common carrier
for hire of live stock, and it is inevitable that there
should be more or less unpleasant features connected with
this department of its activities.  It is not every petty an-
noyance of the nature of that in this case that the courts
will enjoin.  The whole circumstances and what is fair,
just and equitable between the public at large and the
railroad company in the discharge of its duties as a com-
mon carrier must be considered.  An injunction will be
granted when the evils complained of are substantial and
cannot be otherwise remedied, and when the business may
be conveniently carried on elsewhere.

The decree of the district court enjoined the defendant
for maintaining stock-yards within two blocks from the
place where the same are now located.  The defendant
complains that the decree is so indefinite and uncertain in
its requirements that it should be reversed.  The principal

complaint seems to be that the court did not fix the exact spot to which the stock-yards should be moved, and it is said: "No place the company might select, if it tried to abide by the order, would furnish the slightest protection under this decree. The stock-yards are no more a nuisance at the present location than they would be three blocks from it." It was not the duty of the court to fix a place where the defendant might carry on its business. Its only function was to restrain a public nuisance. It found from the evidence that the surroundings of the stock-yards were such that, if moved less than a distance of two blocks in either direction from the present location, their maintenance would still annoy the people of the village. Beyond that it left the question of their location to the good judgment of the defendant, and very properly did not seek to interfere with its discretion. We think the evidence supports the decree

The judgment of the district court is therefore

AFFIRMED.