WILLIAM SARRAILLON ET AL., APPELLEES, v. W. L. STEVENSON ET AL., APPELLANTS.

43 N. W. 2d 509

Filed July 24, 1950. No. 32766.

*Paul P. Chaney,* and *Moran & James,* for appellants.

*Lloyd E. Peterson* and *Betty Peterson Sharp,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an action by appellees for an injunction against W. L. Stevenson, Julien R. Stevenson, and Stevenson Packing Company, appellants, to prevent them from slaughtering hogs and cattle, maintaining and using stockyards, and operating a cold storage or locker plant on property owned by them in Nebraska City.

The basis of the case of appellees is the claim that the operations of appellants are contrary to and a violation of ordinances of the city prohibiting them at the location where conducted, and that they, as conducted, constitute a nuisance. The substance of the defense of appellants is that they have properly and legally conducted their business, a denial of violation of any ordinance of the city, or that they have caused or that there exists a nuisance because of their business or any condition resulting therefrom.

The trial resulted in findings by the district court that appellants should not be enjoined from operating the cold storage plant, the smoking of meats, or the rendering of edible animal fats incidental thereto; that the slaughtering of animals and the yard in which stock is temporarily kept was a violation of ordinances of the city; that the property of appellants was in the "business district" and not in the "industrial district" under (zoning) ordinance No. 643 of the city; and that appellants should be enjoined from using any part of their premises for the purpose of slaughtering animals or for a stockyard. The decree rendered was consistent with

the findings and enjoined appellants or anyone acting in their behalf from using any part of their real estate for slaughtering any animals or as a stockyards for the retention of any animals. Appellants made a motion for a new trial. It was denied, and they have appealed.

Appellants W. L. Stevenson and Julien R. Stevenson have at all the times important to this case owned the part of Block 81 in Nebraska City upon which the operations are had which are sought to be enjoined. They own and conduct thereon in the name of Stevenson Packing Company a cold storage plant, the slaughtering and processing of meat for food, the rendering of edible animal fats, the curing of meats by smoking, and have and use an enclosure for yarding cattle and hogs.

Eight of the appellees own and occupy residences as their homes on other parts of the same block. A majority of the other appellees own and occupy homes near the property of appellants. This area is, and for many years before any of the acts of appellants complained of herein, was a residential area and is classified as such in the last zoning ordinance of the city.

The building of appellants was a mill, but has not been used as such since about 1925. Part of it was used for dead storage for about ten years. In the fall of 1935 a part of the building was first used for cold storage or as a locker plant, and its operation has been continued to the present. In the spring of 1936 other parts of the building to the rear of the locker plant were put in use for slaughtering and processing hogs and cattle, and this has been also continued. An enclosure near the alley of Block 81 referred to in the record as "stockyards" or "holding pen" was constructed at the rear of and attached to the building. It has been used to yard hogs and cattle, sometimes for a few hours, sometimes for a longer period—7 a. m. to 5 p. m., and on occasions cattle were kept there the balance of the day of delivery, the following night, and part of the second day. The yards are constructed of posts, boards, and gates. There

is no shed or covering. Water or feed is not furnished to the stock while detained there. There were five to fifteen hogs—"maybe a few more" and four to eight cattle—"somewhere in there" received, yarded, and killed each day when there was slaughtering at the plant, on an average of three to four days each week.

A chain was fastened to a hind leg of each hog killed and it was elevated head down by a power hoist. It was killed by sticking a knife in the throat. The cattle were killed by the blow of a hammer on the head. In dressing the animals their contents, except the heart and liver, were deposited on the floor. The contents of the stomach were removed therefrom and left on the floor. Later the offal, except the contents of the stomach, was removed from the building by carrying it in the open and placing it in barrels outside under a lean-to with the south side entirely exposed to the open. There was no outside wall to the south and no screen. The barrels were, much of the time, at least, not covered. Later they were loaded or the contents dumped into a truck or other containers in a truck at or near the alley and taken away by a rendering company. The length of time the barrels and their contents remained at the packing plant was uncertain and irregular. The contents of the stomachs were scooped from the building to the pen attached thereto and later scooped in open and uncovered trucks backed in from the alley and hauled through it and the residential area and deposited outside the city. Drippings from the trucks were seen as they moved away from the plant through the alley.

It is undisputed that frequently when the barrels were removed bones, parts of the heads, hoofs, and organs of the animals and other contents thereof were thrown to or left for dogs that gathered in considerable numbers, and this material was carried by them to the homes and lawns of appellees and others, gnawed and eaten by the dogs, and the remnants thereof left on the

yards and lawns about the homes to be cleaned up, removed, and disposed of by the occupants.

The retaining of animals at the yard of the plant under the conditions recited without feed or water, the fact that they were strange to each other and in an environment which afforded the smell of blood, the dragging and lifting hogs by a chain fastened to one leg, and the sudden sticking of a sharp knife in their flesh caused frequent and for some periods continuous unusual bellowing, squealing, and hideous cries of anguish by the animals which were disturbing, annoying, and to some of the more sensitive persons in the area, harmful.

The commencement of the operations of the slaughterhouse at this location was the advent of an invasion of flies in this area. There had been no unusual experience in this area of the city with such insects before, and many of appellees had lived there many years, and one of them for more than 60 years. There were small flies and big flies, houseflies, and blowflies of the most annoying and revolting kind that appeared and gathered at the plant and traveled to and around and in many instances got into the homes. They were seen coming from the location of this plant, and there is no reasonable doubt but that that was their source and principal place of assembly. Rats invaded the neighborhood, and there has been a continual war between the residents and the rats.

The operation of the packing plant and the conditions caused by it has created noisome, offensive, disturbing, and in some instances nauseating and sickening odors that taint and fill the atmosphere around and in the homes of appellees and in the area generally—"* * * it just smells so bad it is sickening." This is especially true in the summer. They cause much discomfiture, annoyance, and distress. Persons lose their appetites, do not care to eat, and are driven from their meals. The odors disturb their sleep and rest. They awake at night

with a feeling of sickness and a longing for fresh unpolluted air. When the wind blows from the direction of the plant the odors are bad enough to cause persons to close the openings in their homes. If they did not they couldn't stay there. They are deprived from sitting on and enjoying the porches of their homes as they formerly did. They are prevented from having friends and entertaining in their homes. Some have left their homes and driven in the country to get away from these. These smells are "like South Omaha." They are regular packing house odors and are offensive. An employee of the garbage firm loaded and hauled away the garbage for about a month in 1948. It was a soft mass and gave off awful sickening odors which continued for the entire trip of about three miles to the city dump. It made him sick. He was unable to continue and refused to work. He was transferred to another route. Another garbage truck operator said the packing plant was the last stop on the route because "That is the worst thing. Q. In all Nebraska City it is the worst? A. That is right."

These conditions have depreciated greatly the value of the property of appellees and no residence has been constructed in the vicinity of this plant since it commenced the packing house business.

There is no fixed or arbitrary rule governing cases of this class. Each case must be determined by the facts and circumstances developed therein. Beisel v. Crosby, 104 Neb. 643, 178 N. W. 272. The facts shown by the evidence have been stated. There is no reasonable doubt but that appellants have used their property for purposes and in a manner which deprives appellees and other residents of normal and ordinary sensibilities living in the area around it of the reasonable and comfortable use of their property, and so that the accepted law of decency is violated and the value of their property because thereof has been substantially depreciated. Complete freedom and full use and enjoyment of home life in the neighbor-

hood has been limited if not destroyed. A court of equity has jurisdiction to enjoin such a use of private property when its continuance would occasion a constantly occurring grievance. Lowe v. Prospect Hill Cemetery Assn., 58 Neb. 94, 78 N. W. 488, 46 L. R. A. 237.

Appellants argue that the business in which they are engaged is legitimate and legal, that it cannot be conducted without the conditions complained of in some degree, and that if this is sufficient reason for abating the business as a nuisance it must necessarily be abandoned. They assert that the injunction granted herein violates provisions of the state and federal constitutions. It has not heretofore been considered that a property owner had a vested right in or a constitutional privilege to maintain or continue a nuisance. The evidence of appellants is that every slaughterhouse or packing plant has its own characteristic odors; that the animals brought to the plant, yarded there, and killed make noises different from those made by them in other circumstances; and experience, knowledge, or ingenuity has not discovered or devised any method or manner of eliminating either the odors or the noises. Appellants claim that the plant involved here is kept and operated in as good a manner and condition as it can be and as other similar plants. An answer of the contention of appellants in this regard is not difficult. They may lawfully conduct their operations anywhere if they acquire a sufficient area so that the objectionable features and conditions thereof are confined to their property, or they may conduct them at such places where businesses of like kind are carried on —where the result thereof is not to deprive people of the comfort and enjoyment of their homes or to depreciate or destroy the value of their property. An industry of this sort may not be conducted at any place or at all places merely because it is legitimate and lawful. The selection of the place of business is not necessarily left to the owner alone. That subject is often a matter of both private and public concern. Beisel v. Crosby, *supra.*

No amount of skill, effort, or attention can, according to the evidence in this case, wholly eliminate the distressing conditions or results of the operation of a packing plant in close proximity to residences. Appellants would not assert that they could with legal immunity physically invade their neighbors' property and thus render it less useful to them. There is no difference in effect between a physical invasion which limits the use of or destroys the property and an invasion by permeating or by noise and insects that results in the same kind of a limitation of use or depreciation of property. A legitimate industry is generally not a nuisance, but it may become a nuisance in fact by reason of the manner of its operation and conditions implicit in and that unavoidably result from its operation, especially in a residential or other closely occupied area. Beisel v. Crosby, *supra;* Village of Kenesaw v. Chicago, B. & Q. R. R. Co., 91 Neb. 619, 136 N. W. 990; Annotation, 27 A. L. R. 329; 48 Am. Jur., Slaughterhouses, § 5, p. 463; Rhoades v. Cook, 122 Iowa 336, 98 N. W. 122; Robinson v. Westman, 224 Minn. 105, 29 N. W. 2d 1, 174 A. L. R. 746. See, also, Saier v. Joy, 198 Mich. 295, 164 N. W. 507, L. R. A. 1918A 825; Brede v. Minnesota Crushed Stone Co., 143 Minn. 374, 173 N. W. 805, 6 A. L. R. 1092.

A court of equity will not usually enjoin the operation of a legitimate business conducted at a proper place solely because of the manner of its operation, without regard to how serious may be the grievance caused thereby. In the first instance, at least, it will require the cause of the grievance to be corrected and will enjoin conduct of the enterprise perpetually after it has been proven that no application of endeavor, science, or skill can effect a remedy or that the owner cannot be induced to conduct it properly. Mathews v. Mozer, 111 Neb. 71, 195 N. W. 943; State ex rel. Towle v. Eyen, 130 Neb. 416, 264 N. W. 901.

In Stuhr v. City of Grand Island, 120 Neb. 491, 233 N. W. 886, it is said: "In granting an injunction against a

nuisance, a court of equity will not go beyond the necessities of the particular case before it." The situation here is different. The evidence of appellants establishes that the objections to the operations complained of are substantially matters inherent in the nature of the business and that no application of effort, science, or ingenuity will afford a remedy in that location. There is a class of business, of which slaughterhouses and fertilizing plants are examples, which, from their very nature, cannot generally be conducted except in more or less isolated places. No matter how scientifically the plants are constructed or how hygienically they are operated, they emit noxious, noisome, and offensive, and to many persons, nauseating odors. They produce disturbing noises and often cause an invasion of insects and rodents. Few people can or will reside or stay within the reach of them except under the compulsion of necessity. The courts will not, where these conditions exist, permit such operations to continue in districts where people have their homes or where they are compelled to congregate in pursuit of their ordinary avocations, nor on such a restricted area that their operation must of necessity render materially less valuable to their owners abutting and adjacent property. A proprietor cannot be permitted to convert his property into a nuisance to the detriment of other nearby proprietors. The area where the plant here in question is located is essentially residential. The grievances shown by the evidence are an invasion of the property of appellees to which they ought not to be compelled to submit. In other words, the plant is at a place where it has necessarily caused injury to the adjoining and nearby property owners, and it is thus a nuisance and should be abated in the respects and to the extent hereinafter stated.

Appellants offered evidence tending to show that they have properly conducted their business. If this is accepted as the fact it is not sufficient to defeat the granting of appropriate relief to appellees. The exercise of

due care by the owner of a business in its operation does not constitute a defense to an action to enjoin its operation as a nuisance where notwithstanding such care the business as conducted seriously disturbs persons of normal and ordinary sensibilities in the comfort, use, and enjoyment of their homes and interferes with their property rights. In Village of Kenesaw v. Chicago, B. & Q. R. R. Co., *supra*, a nuisance was abated by injunction although the court found that: "* * * while the railroad company seems to have exerted reasonable efforts to remedy the conditions, it has been unable to prevent the existence of a nuisance, at least to an extent very annoying to the residents living near by." Lead v. Inch, 116 Minn. 467, 134 N. W. 218, 39 L. R. A. N. S. 234, Ann. Cas. 1913B 891, states the rule as follows: "If the manner in which it is conducted results in noxious odors, disagreeable noises, to the discomfort and annoyance of adjoining property owners, it is a nuisance within the meaning of the law, regardless of the question whether defendant exercised due care to so manage the property as to avoid results of that nature. Joyce, Nuisances, 202; Berger v. Minneapolis Gaslight Co. 60 Minn. 296, 62 N. W. 336. In other words, where the business casts off noxious and unwholesome odors, in fact annoying to and impairing the comfort of adjoining property owners, it is no defense to say that it was conducted in a reasonable and proper manner, and that the odors emanating therefrom were such as are ordinarily incident to the business when properly conducted."

Appellants argue that the district court did not find that any of their operations were a nuisance. They contend that the court found for them on this issue, and in any event that it cannot be considered because appellees did not cross-appeal. The trial court did not by the use of the word "nuisance" find that one existed. The court did make a separate, distinct, and general finding that "* * * defendants should be enjoined from using any part of their said premises * * * for * * * slaughtering

animals thereon, * * * and from using any part of their said premises * * * for a stockyards * * *." It is not inherently impossible that this included a conclusion that the specified uses of the premises constituted a nuisance. This is more probable than that the finding quoted related only to a violation of a zoning ordinance of the city. The view that the district court wholly disregarded or found against the claim of appellees that there was a nuisance is on this record a strained one. If that had been the view of the court, the judge thereof would not have been interested in a view of the property of any of the parties. If appellants were located and operating in violation of a zoning ordinance these facts would have resolved the case. The manner, result, or conditions caused by the operations would not have been important or interesting. But the court did extensively view and examine the property of all of the parties to the case. This points to his interest and concern in the existence or nonexistence of a nuisance. It should not be assumed that he did an unimportant or frivolous thing. The claim that a cross-appeal by appellees was a prerequisite to a consideration in this court of the issue of nuisance is obviously without merit. There is no record that the district court found that appellants were not maintaining a nuisance. The absence thereof prevented appellees from stating in a cross-appeal how the issue was decided in the trial court—one of the indispensable requirements of a resort to the remedy of cross-appeal. Any attempt by them to present a cross-appeal in this case as to the finding of the trial court on this issue would have been frivolous and futile.

The district court saw and heard the witnesses testify. The very extensive record in this case consists largely of testimony orally given at the trial on the issue of the existence or absence of a nuisance. It is in many respects in irreconcilable conflict. The trial judge viewed the premises under circumstances favorable to ascertaining the true conditions. Appellants have significantly

avoided consideration, analysis, or discussion of the evidence on this issue, and have failed to point out any defects or insufficiency therein. This case has been, as the law provides, examined and considered de novo. The conclusion is that the existence and operation of the cold storage or locker plant of appellants, the rendering of edible animal fats, and the curing of bacon and hams by smoking incidental to the cold storage business, is not objectionable and should not be interfered with in this case, and the relief sought by appellees in reference thereto should be denied; that the slaughtering of animals on any part of Block 81 of Nebraska City, Nebraska, owned by appellants, or the use of any part thereof as a stockyards for enclosing and detaining animals constitutes and is a nuisance; and that appellants and each of them, and any and all persons acting for or on their behalf, should be permanently enjoined from using any part of said premises for the slaughtering of any animals or for a stockyards.

The judgment of the district court should be, and the same is hereby, affirmed.

AFFIRMED.